## OHIO OIL CO. v. UNITED STATES.
### Civ. No. 2914.

District Court, D. Wyoming.
April 1, 1946.

Dines, Dines & Holme, Harold D. Roberts, and Robert E. More, all of Denver, Colo., and W. H. Everett, of Casper, Wyo., for plaintiff.

Carl L. Sackett, U. S. Atty., of Cheyenne, Wyo., Francis B. Critchlow, Sp. Asst. to Atty. Gen., and Marvin J. Sonosky, Atty., Department of Justice, of Washington, D. C., for defendant.

KENNEDY, District Judge.

This is a suit brought under the Tucker Act, 28 U.S.C.A. 41(20), seeking to recover the sum of $9,186.96. In due time, after the filing of the complaint, answer was interposed by the defendant and a trial was had to the Court, at the conclusion of which it was agreed that the case would be submitted upon written trial briefs. After a number of extensions of the time fixed, which were mutually agreeable to counsel, such briefs were submitted and the matter is now before the Court for consideration.

In passing it may be said that counsel have been diligent, effective and most helpful to the Court in presenting their divergent contentions. In view of the fact that defendant offered no testimony in the case but relied upon the documentary evidence presented by the plaintiff, the matters developed by cross-examination of plaintiff's witnesses and that the questions presented are seemingly those of law which points relied upon are clearly contested in the briefs, it would seem to eliminate any necessity of a specific reference to the pleadings.

A running sketch of the transactions which lead up to the controversy are as follows: Under the Act of February 25, 1920, 41 Stat. 437, 30 U.S.C.A. §§ 22, 48, 181 et seq., commonly known as the "Mineral Lands Leasing Act", the defendant on August 25, 1920, acting as lessor through the Secretary of the Interior, leased a parcel of land in the Lance Creek Oil Fields, Niobrara County, Wyoming, described as N½ S½ of Section 4, Township 35 North, Range 65 West of the 6th P.M., containing 160 acres, more or less, which gave to said lessees the exclusive right and privilege to drill and mine, extract, remove and dispose of all oil and gas deposits in or under said land, which lease was made under Section 19 of the Leasing Act. Said lease was thereafter and on the 23d day of June, 1922, assigned to the plaintiff, which assignment was duly ratified by the Secretary of the Interior. Thereafter the plaintiff, with other owners of leases in the Lance Creek Field, entered into a Unit Agreement as provided by an amendment to the original Act, which was filed with and approved by the Secretary of the Interior, becoming effective on January 1, 1938, after which all production from the land here concerned was allocated in accordance with the terms of the Unit Agreement, royalties being paid the defendant upon the gross proceeds derived by plaintiff from the production as so allocated.

In the first instance, the oil produced from said field was not great, but somewhere around 1939 the production was measurably increased by drilling to the lower sands. Under the leasing statute and the terms of the lease, it was provided that the Government should be paid, so far as the purposes of this case are concerned, a royalty on the basis of 12½% of the oil or gas produced and should have the right to have said royalty paid in kind unless it should elect under certain circumstances to receive the value thereof. It was also provided that the lessee under the lease should at all times keep the defendant advised of all contracts for sales of oil from the premises and such action on the part of the plaintiff was carried out.

In 1937 the defendant served notice on the plaintiff that it elected to take its royalty in kind, which arrangement lasted for

practically a year when the Government again reverted to the policy of receiving its royalty in value and these royalties were paid to the defendant on the basis of the sales made by the lessee during the period, all of which prices were determined by sales contracts on file with the Secretary of the Interior.

The principal contract, which provided for the disposition of the product of the field, was entered into in August 1936, which ran until July 1941, calling for a price of 25¢ per barrel under the so-called "Mid-Continent" price which was $1.02 per barrel, and it seems that it was considered that this was the current posted field price for the oil in the Lance Creek Field upon which the Government royalties were computed. Other contracts were entered into for the sale of such oil from the field upon the same basis, which extended through, or well into, the period concerning which royalties are here in dispute—from July 1, 1939 to April 1, 1941.

The Government, through the Secretary of the Interior, served notice on the plaintiff by which it purported to fix a minimum price for its royalties upon the basis of value upon the oil allocated to plaintiff's lease, and finally fixed a minimum price of $1.02 per barrel for the period beginning July 1, 1939 and covering the period to April 1, 1941, which computed upon the royalties for oil produced in excess of the amount paid by plaintiff, amounted to the sum here sued for of $9,186.96.

This action on the part of the Secretary of the Interior was fought bitterly by the plaintiff and perhaps other producers in the field but without success in securing a reduction in the minimum price of oil fixed by the Secretary of $1.02 per barrel.

The Secretary on April 2, 1942, notified the plaintiff by letter that payments of the royalties on the minimum price fixed by the Secretary would have to be paid and that unless they were paid within fifteen days, appropriate legal action would be taken to cancel the leases and to collect all royalties due. Thereafter, and within the fifteen day period, the plaintiff, under protest, paid the amount demanded and here in controversy to the Secretary coupled with the express understanding and agreement that the amount should be deposited in the Treasury of the United States in a trust fund established by appropriate Acts of Congress, to be held pending determination of the order of the Secretary requiring such payment and that so much thereof as plaintiff should be entitled to receive out of said payment should be paid to it in the event it was judicially declared that the plaintiff should be entitled to its return. This money has since been held in the fund and for its recovery this suit has been instituted.

No attempt has been made in the foregoing statement to give detailed facts but a brief outline of the history of the various transactions which become the background of the legal controversy here presented. Other facts which may be pertinent may be referred to in a discussion of the points upon which counsel seem to agree the decision of the Court must be predicated, and these will now be discussed.

## I. Jurisdiction of the Court

The first attack by counsel for the Government upon the claim of plaintiff is in the form of a challenge to the jurisdiction of the Court. It is, of course, the first duty of the Court to determine its jurisdiction and it becomes especially important where the absence of such jurisdiction is suggested by one of the litigants. The jurisdiction of the Court is invoked under the Tucker Act, 28 U.S.C.A. § 41(20), which confers such jurisdiction on the District Court of all claims founded upon the Constitution of the United States or any law of Congress or upon any regulation of the Executive Department or upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated in cases not sounding in tort. In this respect, counsel argue that although the suit is brought for the recovery of a sum paid under protest into a certain trust fund, which recovery is sought under a construction of the Federal Leasing Act, the regulations adopted thereunder, a lease upon the lands from which the oil was derived

concerning which the value of the oil was attempted to be fixed by the Secretary, and the agreement between the plaintiff and the Secretary that the money so paid would be deposited in the trust fund to be repaid to the plaintiff in the event it should be judicially declared that the plaintiff was entitled to receive the same, that nevertheless the suit does not fall within the scope of the Tucker Act. I think it is clear that a determination of the right of the plaintiff in the premises rests upon the construction of the Federal Leasing Act and the regulations adopted thereunder, together with a construction of the lease issued to plaintiff by the Secretary, the recovery sought being in an amount less than the statutory limitation. This theory seems to be sustained by a number of cases, among which may be mentioned Christie-Street Commission Co. v. United States, 8 Cir., 136 F. 326, which was followed by the District Court in Ross Packing Co. v. United States, D.C., 42 F.Supp. 932.

■ No satisfactory legal distinction between contracts founded upon or arising under *constitutional or statutory provisions* has been found, as pointed out by Judge Sanborn in the Christie-Street Commission case, supra. In order to invoke the jurisdiction of the Court under the Statute it is not necessary that the right of the plaintiff to recover must be pre-determined in order to sustain the jurisdiction but only that the claim falls within the category enumerated in the Statute. Furthermore, it appears to me that when the money was paid under protest by the plaintiff and the Secretary agreed in writing that it would be placed in the trust fund of the Government and repaid in whole or in part should it be judicially declared that the plaintiff was entitled to recover, that this constituted a contract between the plaintiff and the Secretary on behalf of the Government which the Government is bound to respect. Neither do I believe it beyond the power of the Secretary to make this stipulation by which he agreed to submit the question of repayment to judicial declaration. No convincing authority has been submitted to justify a conclusion that this act was not within the prerogative of that official. In fact it purports on its face to be fair and equitable that the Secretary should be willing to submit a question involving the legality of his own act to an unbiased, judicial tribunal for such decision.

■ But again, counsel for the Government contend that a deposit in the trust fund cannot be recovered or paid out except upon the affirmative finding of the Secretary that it is due and owing. The plaintiff contends that under the provisions of 43 U.S.C.A. §§ 96 and 98a such excess payment is provided for. These sections in substance provide that if any person has made payments under the Public Land Laws in excess of the amount he was lawfully required to pay, such excess shall be repaid to such person. Under 98a the coverage of this Act was made to relate to the sale, entry, lease or other disposition of public lands.

The query remains as to whether or not this must be preceded by the affirmative decision of the Secretary that the claimant is entitled to recovery. In United States v. Laughlin, 249 U.S. 440, 39 S.Ct. 340, 63 L.Ed. 696, the Supreme Court seems to set at rest the question as to the circumstances under which repayment could be sought. In that case it was held that the Secretary by the Act is given exclusive jurisdiction to determine questions of fact but when the undisputed facts shown to his satisfaction call for repayment as a matter of law, his adverse decision is reviewable by the Courts and may be reviewed by an action brought by the claimant. That case arose under a question of jurisdiction concerning the · Court of Claims but it seems· to be without controversy that the District Courts under the Tucker Act, within the statutory limitation as to amount, have the identical jurisdiction of the Court of Claims.

Applying this construction to the case at bar, we find there is no dispute of fact here. It is admitted that the Secretary made a finding in which he adjudged the value of the oil per barrel upon which plaintiff was required to pay royalty at $1.02. The question to be determined is one of law as to whether or not the Sec-

retary had the legal right under the Leasing Act, the regulations established thereunder and the lease of the lands to the plaintiff to fix an arbitrary value per barrel for royalty payments.

This being a question of law tendered by the plaintiff's complaint, it would seem that the Court has jurisdiction to investigate that claim and determine it one way or the other. I think this brief review of the circumstances surrounding the litigation here, together with the authorities, justify the conclusion that the Court has jurisdiction of the cause and it will be so held.

## II. The Government in a Proprietary Capacity

One other preliminary point should be mentioned and that is as to whether the Government in the circumstances here was acting in a governmental or proprietary capacity. Counsel for defendant does not seem to have been entirely consistent in its approach to this question. On page 54 of the transcript of the opening statements in the record, counsel for the Government said: "We admit that the Government here is standing as proprietor, and that it is bound by the terms of the contract, as the lessee is bound by its terms, we say, of course, there is no question. It is just a question of construing the contracts," while, on page 36 of the trial brief, the following statement appears: "In the first place it must be borne in mind that we are concerned in this case with matters having to do with the policy of the Federal Government with respect to the disposition of its mineral lands, with public revenues derived from such disposal and with the distribution of such revenues to the Treasury, the Reclamation Fund and to the State for schools and roads (Leasing Act, Sec. 35 [30 U.S.C.A. § 191]), all of which are matters concerned with public rights and public interests."

The comparison of these two statements strongly indicates that in the first instance counsel conceded that the Government in its operations under the lease was acting in the capacity of a proprietor, while the language in the brief strongly indicates that those acts were of a governmental nature. An examination of the cases cited in the brief does not seem to bear out the contention that in this instance the Government was acting in a governmental capacity. The record here is that the Government, being the owner of the land from which the oil was taken, was leasing it upon a royalty basis for the purposes of gain to itself. There was nothing to suggest the lease of the lands was for governmental purposes other than the fact that the gain thus realized might be used for beneficial purposes, but such is not the line of demarkation between the two functions of the Government. This distinction is clearly drawn by Judge Sanborn in Illinois Trust & Saving Bank v. City of Arkansas City, 8 Cir., 76 F. 271, at page 282, 34 L.R.A. 518, where it is said: "A city has two classes of powers,—the one legislative, public, governmental, in the exercise of which it is a sovereignty and governs its people; the other, proprietary, quasi private, conferred upon it, not for the purpose of governing its people, but for the private advantage of the inhabitants of the city and of the city itself as a legal personality. In the exercise of the powers of the former class it is governed by the rule here invoked. In their exercise it is ruling its people and is bound to transmit its powers of government to its successive sets of officers unimpaired. But in the exercise of the powers of the latter class it is controlled by no such rule, because it is acting and contracting for the private benefit of itself and its inhabitants, and it may exercise the business powers conferred upon it in the same way, and in their exercise it is to be governed by the same rules that govern a private individual or corporation. (Citing cases.) In contracting for waterworks to supply itself and its inhabitants with water, the city is not exercising its governmental or legislative powers, but its business or proprietary powers. The purpose of such a contract is not to govern its inhabitants, but to obtain a private benefit for the city itself and its denizens."

I think that the analysis there given, sustained by ample authority, justifies the conclusion for whatever purposes it may be invoked in this case, that the Govern-

ment in leasing the lands here in controversy was acting in a proprietary capacity and must be governed the same as a private individual in leasing lands under similar circumstances.

### III. The Right of the Secretary to Fix Minimum Prices on Royalty Oil

■ It is the contention of the plaintiff that the Secretary of the Interior had no right under the circumstances here involved to fix a minimum price to be paid by the lessee on the lessor's share of the oil produced as royalty. On the contrary, it is the contention of counsel for the Government that the Secretary in this respect was acting within his prerogative. While this phase of the lawsuit is the very heart of the controversy on the merits, it would unduly extend this memorandum to rehearse the various provisions of the Act of February 25, 1920, the regulations adopted thereunder, the lease under which the lands were held and operated, and the so-called Unit Agreement effecting the operation of the lands in the field. Suffice it to say that after examining all these documents, together with their legal effect upon the rights of the parties, I have arrived at the conclusion that the Secretary had no legal right to fix a minimum price for its royalty oil and require the lessee to pay that price or to submit to a forfeiture of its leasehold rights. The Federal Leasing Act appears to give no specific right to the Secretary to fix a minimum price on royalty oil. Section 36 of that Act provides that all royalty accruing to the United States shall on demand by the Secretary be paid in oil or gas. It also provides that he may offer for sale at public auction, upon notice in advertisement or on sealed bids, such royalty oil and that in the event he deems it unwise to accept the offer of the highest bidder, he may re-advertise the same for sale or sell it at private sale at not less than the market price or accept the value thereof from the lessee. This can scarcely be construed as a grant to the Secretary to fix such value and compel the lessee to pay it regardless of what may be the market price in the field or at what price the lessee is disposing of its own portion of that oil. In addition to this feature of the case, the lease itself reserves no such privilege nor does it by the terms grant this authority to the Secretary. The lease is similar to that considered in the Kettleman Hills Case (unreported but a transcript being furnished to the Court; in United States v. General Petroleum Corporation 467-B Civil, S.D.Cal.) in which Judge Beaumont specifically held that under the terms of that lease the Secretary had the right to fix a minimum price on gas and gasoline products but not on oil. Neither can it be said that under the terms of the Act itself or the executed lease could the Secretary adopt regulations which would enlarge his rights not contemplated under the Act and especially not reserved and contracted under the terms of the lease itself. Neither did any provision in connection with the Unit Agreement extend any of his rights because it is specifically provided that any such agreement should not be in violation of any leases then in existence. The rights of the United States were amply protected by giving the Secretary authority to dispose of the Government's portion of the oil by advertised sale or other sale at not less than the prevailing market price and that all sales of oil by the lessee should be registered with the Secretary so that at all times he had complete knowledge of prices received for the oil produced.

For a considerable period the oil produced in the Lance Creek Field, on account of the lack of transportation facilities, was not easily disposed of, making it necessary to negotiate contracts at considerably less than was paid for the same type of oil in other fields which in turn resulted in a posted field price in that field at a price per barrel less than the posted price in other fields where the oil was produced and disposed of under more favorable conditions. As the evidence shows, for a time the attempt to dispose of the oil at a more favorable price was unsuccessful but eventually contracts were secured which seemed to bring the best price that could be obtained, which contracts called for delivery over a substan-

---

1 No opinion for publication.

tially long period of time, running into the period for which a minimum price was fixed by the Secretary in the case at bar. When the demand was made for the additional minimum price per barrel for the royalty oil of the lessor, the contracts then in existence compelled the lessee to sell the oil under the terms of those contracts and had the lessee complied with the terms and conditions of the Secretary's demand, he having failed in several attempts to secure a higher price on advertised bids and thereby electing to accept the value of the oil from the lessee, would have required the lessee, in order to avoid a forfeiture of its lease, to pay to the Government 25 cents per barrel more than .it was receiving under its contracts.

An analysis of the transportation facilities fails to disclose any such improvement in the conditions surrounding the operation of the field and the disposal of the product so as to justify a conclusion that the plaintiff would be able to pay the additional demand without a positive loss to itself. These circumstances, as disclosed by the evidence, tend to show that the posted field price in the Lance Creek Field was reasonably the market price of the oil and was therefore a fulfillment of the provisions of the Leasing Act that the Government was receiving the value of the oil from the lessee.

The evidence discloses no circumstances which will justify a conclusion in the mind of the Court that there was any unlawful coalition among purchasing and selling companies or pipeline operators to disturb the determination of a fair market price of oil in the field.

Considering the knowledge of the Secretary available at all times by the contracts establishing the price and his ratification of those prices, coupled with his unsuccessful attempt to sell the Government's portion of the oil at public auction, and thereafter electing to receive its royalties in value from the lessee, places that official in a very inequitable position in attempting to fix a higher price and seeking to collect it under threat of forfeiture. He stood silently by, fully recognizing the price that was being paid under existing contracts, and electing for a time to receive that price from the lessee in lieu of taking the Government's royalty in kind, and then suddenly demanded a higher price from the lessee for the Government's share of oil in the face of the fact, as has been heretofore stated, that under the terms of the Leasing Act and the lease itself he had no authority to fix a minimum price per barrel on the Government's royalty interest.

This, in brief, is the only way in which I can analyze the principal point of controversy in the case at bar and, shorn of all technicalities, in consideration of the fact that the litigation must be treated the same as between private parties, the equities should rest strongly with the plaintiff and it will be so found.

## IV. Estoppel

It has been suggested that the rules of equitable estoppel should be applied to the situation as to the Government in this case. If the Government was in the circumstances acting in its capacity as proprietor the doctrine should be applied to it the same as a private individual. What has been said in the preceding paragraph presents a sufficient basis upon which the doctrine of estoppel can be applied. The Secretary, by permitting the plaintiff to go forward on the assumption that the price at which the oil was being sold was satisfactory to him, caused the plaintiff to rely upon the acts or silence of that official to the extent that the Government should be estopped from asserting a claim which would result in great damage to the plaintiff if now recognized. The doctrine of estoppel is too firmly established to require citation of authority.

## Conclusion

For the reasons stated, the issues in the case will be determined in favor of the plaintiff and for the recovery of $9,186.96; and an order may be entered that counsel for plaintiff, in collaboration with their opponents, shall submit findings of fact and conclusions of law in harmony with the suggestions made in this memorandum but incorporating such basic facts and conclu-

sions as will support a judgment to be tendered and reserving to the defendant desired exceptions on or before May 1, 1946.